**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| KOCH DEVELOPMENT CO., INC., formerly known as Yorkshire Village, Inc., | ) ) ) ) |
| **Plaintiff,** | ) ) |
| vs. | )     **Case No. 4:06cv0688 TCM** ) |
| CLARENDON AMERICA INSURANCE COMPANY, | ) ) ) |
| **Defendant.** | ) |

## <u>MEMORANDUM AND ORDER</u>

This equitable garnishment action is before the Court on the cross motions for summary judgment filed by the parties, plaintiff Koch Development Company, Inc. ("Koch"), formerly known as Yorkshire Village, Inc., and defendant Clarendon America Insurance Company ("Clarendon"). [Docs. 63, 66]

### <u>Background</u>

Donald and Susan Dobbs[1] (collectively referred to as the "Dobbses") signed a commercial lease dated October 20, 1988, for approximately 7400 square feet[2] at 1235 South Laclede Station Road in Webster Groves, St. Louis County, Missouri. (Pl. Ex. 6.) The lessor was Yorkshire Village, Inc. (now known as "Koch"), and the leased property was part

_____

[1]Susan Dobbs is sometimes referred to as "Marilyn Sue." For ease of reference, the Court will refer to her only as "Susan."

[2]This square footage was later amended to include an additional 800 square feet. (Pl. Ex. 9.)

of a shopping center owned by the lessor. (Pl. Ex. 6 and Stip.[3] ¶ 9.) The Dobbses' anticipated use was for the business of "selling tires and related items and the servicing of automobiles." (Pl. Ex. 6.) The lease required, inter alia, that the lessees (the Dobbses) pay a pro-rated portion of 50 % of "all Public Liability and Fire and Extended Coverage Insurance Premiums applicable to the demised premises." (Id. at 5.) Additionally, the lessees had to pay for any increase in the cost of insurance attributable to their use of the premises. (Id. at 4.)

The business referred to in the lease was that of Dobbs Tire & Auto Centers, Inc. ("Dobbs Tire"). (Pl. Stip. ¶¶ 7, 8; Pl. Ex. 8.) Dobbs Tire paid the rent due under the lease. (Def. Stip. ¶ 20.)

Koch purchased an insurance policy from State Automobile Mutual Insurance Company ("State Auto") to insure the shopping center consistent with the lease terms. (Def. Stip. ¶ 29 and Ex. H.) The State Auto insurance policy insured Koch against "property damage, lost rent, and other business losses in the event of a fire." (Def. Stip. ¶ 30.)

Clarendon issued a general liability insurance policy to Dobbs Tire with effective dates from December 1, 2002, to December 1, 2003, and with a premium of $208,992. (Def. Ex. C.) In its application for insurance with Clarendon, Dobbs Tire submitted a list of 39 locations at which it did business. (Def. Stip. ¶ 6.) Included was the Laclede Station Road store, for which Dobbs Tire was listed as "tenant" rather than as "owner." (Id.)

---

[3]"Stip." refers to the designated party's "Stipulation of Uncontroverted Material Facts" for which no genuine dispute exists.

The "General Insuring Agreements" portion of the Clarendon insurance policy read, in relevant part, as follows.

II.     SERVICE ORGANIZATION

This Insurance is issued to the Insured on the express condition that the Insured undertakes to utilize at all times the services of:

Cannon Cochran Management Services, Inc. . . .

(hereinafter referred to as the Service Organization).  This Service Organization shall perform the following duties:

(a)     Subject to 8., Claims, under the General Conditions of this policy, investigate and settle or defend all claims or losses.
(b)     Maintain accurate records of all details incident to payments.
(c)     Furnish monthly claims records on an approved form to the Company.

. . .

III.    GENERAL DEFINITIONS

The following words has [sic] specific meanings under various sections of this policy:

. . .

3.      SELF-INSURED RETENTION:

The words "Self-Insured Retention" shall mean the amount of loss, which the Insured *shall pay first* arising from claims otherwise covered under the policy.  Such Self-Insured Retention shall be primary or underlying to such insurance as is afforded by this policy.  The *Insured shall pay 100% of such Self-Insured Retention <u>before this policy applies</u>*.

(Def. Ex. C at 2GIA, 3 GIA.) (Alterations and emphasis added.)

The "Automobile Liability" portion of the policy included the following.

<u>INSURING AGREEMENTS</u>

A – AUTOMOBILE LIABILITY:  The Company hereby agrees, subject to the limitations, terms and conditions hereunder mentioned, to indemnify the Insured for all sums which the

Insured shall be obligated to pay by reason of the liability imposed upon the Insured by law or assumed by the Insured under contract or agreement, for damages direct or consequential, and expenses, all as more fully defined by the term "ultimate net loss", arising out of any occurrence on account of bodily injury including death at any time resulting therefrom, suffered or alleged to have been suffered by any person or persons (except employees of the Insured injured in the course of their employment), and/or damage to or destruction of property or the loss of use thereof, arising out of the ownership, maintenance or use of any automobile.

. . .

## DEFINITIONS

. . .

2.     PROPERTY DAMAGE – the term "Property Damage" whenever used herein shall mean damage or destruction or loss of tangible property, excluding, however, damage to property owned by the Insured, or damage to property of others in the care, custody or control of the Insured or property which is purchased by the Insured under a contract which provides that the title remain with the sellers until payments have been completed, the liability of the Company being limited to the amount of payments outstanding.  Such property damage shall arise out of an occurrence as defined herein.

3.     AUTOMOBILE – the word "Automobile" shall mean a land motor vehicle, trailer or semi-trailer, licensed for road use.

(Def. Ex. C at 1 AL.)  (Alterations added.)

The Comprehensive General Liability section of the Clarendon insurance policy,

Section II, included the following relevant provisions.

## INSURING AGREEMENTS

This section applies only to bodily injury, personal injury or property damage, which occurs during the policy period and arises out of an occurrence which takes place within the territorial scope of the Policy.

A – COMPREHENSIVE GENERAL LIABILITY:  The Company hereby agrees, subject to the limitations, terms and conditions hereunder mentioned, to indemnify the insured for all sums, including expenses, all as more fully defined by the term ultimate net loss, which the Insured shall become legally obligated to pay as damaged imposed by law because of bodily injury, property damage, personal injury, advertising injury, products liability and/or

completed operations, host/liquor liability property damage to property of others or incidental malpractice which result from a occurrence and which occur during the policy period.

. . .

## DEFINITIONS

. . .

    3.    PROPERTY DAMAGE – The term "property damage" wherever used herein shall mean damage to or destruction or loss of use of tangible property.

. . .

    7.    PROPERTY DAMAGE TO PROPERTY OF OTHERS – The term "property damage to property of others" whenever used in this policy shall mean physical loss or damage to property entrusted to the insured for storage or safekeeping.

    8.    AUTOMOBILE – The word "automobile" shall mean a land motor vehicle, trailer, or semi-trailer, licenses for road and use.

## EXCLUSIONS APPLICABLE TO SECTION II

This Section does not apply to any claim for damages, whether direct or consequential, or for any cause of action which is covered under any other Section of this policy, or

. . .

    (c)    to property damage to property owned, rented to or occupied by the Insured or damage to property of others in the care, custody or control of the Insured.

(Def. Ex. C at 1 CGL, 2 CGL.)  (Alterations added.)

The "General Conditions" portion of the Clarendon insurance policy includes the following relevant provisions.

    8.    CLAIMS:

DUTIES IN THE EVENT OF AN OCCURRENCE, WRONGFUL ACT, CLAIM OR SUIT:

a.    The insured and/or Service Organization specified in the General Insuring Agreements shall immediately notify the Company in writing of any occurrence, wrongful act, claim or suit which may reasonably be expected to result in a claim against this policy.  For the purpose of determining when notice shall be made to the company, the insured shall assume liability does exist, and for the full amount of any claim.

b.    The Insured and/or Service Organization specified in the General Insuring Agreements shall immediately notify the Company in writing of any claim which:

   1.    Equals or exceeds fifty (50%) of the Retained Amount as the total amount demanded for damages:

   2.    Results in the establishment of a reserve, or would reasonably require the establishment of a reserve for damages and Claims Expense which equals or exceeds fifty (50%) of the Retained Amount;

   3.    Regardless of the amount, is still pending thirty-six (36) months after the expiration date of this policy;

. . .

d.    All insureds must:

   1.    Immediately send the Company copies of any demands, notices, summonses or legal papers received in connection with such claims or Suits;

   2.    Authorize the Company to obtain records and other information;

   3.    Cooperate with the Company in any investigation or settlement of the claim or Suit;

   4.    Assist the Company, upon the Company's request, in the enforcement of any right against any person or organization,

which may be liable to the Insured because of injury or damage to which this insurance may also apply; and

     5.     Do all things reasonably necessary to defend and protect both the Insured's and Company's interest.

     e.     No Insured will, except at his or her own cost, voluntarily make a payment, assume any obligation or incur any expense.

     f.     The Company will have the right and opportunity, but neither the duty nor obligation, to associate with the insured in the defense and control of any claim or suit seeking damages in excess of the Retained amount, arising out of any occurrence or which, in the Company's opinion, may create liability under this policy; and in such event:

     1.     The insured and Company shall cooperate fully; and

     2.     No claims expense shall be incurred on behalf of the Company without the written consent of the Company, and notwithstanding such consent, all such Claims Expense shall be reasonable.

(Def. Ex. C at 2 GC-4 GC.)  (Alterations added.)

The Clarendon policy also included the following:

## GARAGEKEEPERS LEGAL LIABILITY

. . .

Excess of Self Insured Retention of Section II, the Company will pay all sums the insured legally must pay as damages for loss to a customer's auto or customers auto equipment left in the insured's care while the insured is attending, servicing, repairing, parking or storing the customers auto.

. . .

AUTOMOBILE PHYSICAL DAMAGE:  The Company agrees, subject to the limitations, terms and conditions of this Insurance, to indemnify the Insured for the loss or damage to customers automobiles located at the insured's garage operation, against All Risks of Direct Physical Loss or Damage including Collision of an Automobile with another object.

CUSTOMER'S AUTOMOBILE – A customer's automobile means a customer's land motor vehicle, trailer, or semi-trailer. Customer's automobile also includes any customer's auto while left with you for service, repair, storage or safekeeping. A Customer is anyone who pays for services performed by your garage operation.

(Def. Ex. C at Clarendon 001338.)

At all times relevant, James Wende was an employee of Dobbs Tire. (Pl. Stip. ¶ 10.) On April 3, 2003, while draining gasoline from one automobile's gas tank, Wende used a blowtorch and hammer to remove the muffler from another automobile in the same bay area as the first. (Id. ¶ 11.) The hot muffler fell into, and ignited, a pool of gasoline from the first automobile. (Id. ¶ 13.) The resulting fire damaged the Dobbs Tire premises and another portion of the shopping center. (St. John Dep., Def. Ex. D, at 27-29.)

On April 8, Dobbs Tire sent Clarendon a Notice of Occurrence about the fire at Yorkshire Village. (Def. Stip. ¶ 33; Def. Ex. I at 3-4.) By letter of April 28 to Dobbs Tire, Clarendon acknowledged receipt of the Notice, reserving its rights and requesting that Dobbs Tire keep Clarendon informed of any developments that might affect its policy. (Def. Stip. ¶ 35; Def. Ex. I at 12-13.) Pursuant to the terms of that policy, Dobbs Tire utilized the services of Cannon Cochran Management Services, Inc. ("CCMSI") to assist it in its claim for the fire loss. (Pl. Stip. ¶ 25; Def. Ex. C at 2 GIA.) On May 15, Clarendon wrote CCMSI requesting the initial evaluation regarding the fire and advising CCMSI that the policy coverage "is in excess of the Self-Insured Retention of $100,000." (Def. Ex. I at 16; Def. Stip. ¶ 36.)

Meanwhile, Koch's insurer, State Auto, acknowledged coverage for the fire and asserted its subrogation rights against Dobbs Tire for the fire loss. (Def. Stip. ¶ 34; Def. Ex.

I at 7-8.)    On July 18, counsel for State Auto wrote Dobbs Tire and CCMSI advising them that the damage from the fire was in the approximate amount of $850,000 to $900,000.  (Def. Ex. I at 38-40; Def. Stip. ¶ 38.)

Throughout the Summer and Fall of 2003, Clarendon was in contact with CCMSI and requested information about the fire claim.  (Def. Stip. ¶ 42.)  By letter of May 22, CCMSI advised Clarendon that they "surmised" that the loss would "undoubtedly exceed Dobbs' SIR." (Pl. Ex. 23.)  The exact amount of that loss, however, was "currently unknown."  (Id.)  The reason for this uncertainty was, at least in part, that Dobbs Tire had paid "considerable expense out of pocket" and that figure was as yet unknown.  (Id.)

At his May 2007 deposition, Chuck St. John, a CCMSI representative, testified that as the third-party administrator for Dobbs Tire, he had prepared documents recording payments he or CCMSI had made on behalf of Dobbs Tire to satisfy the SIR obligation, but he had no records of any payments made by Dobbs Tire or its representatives.  (St. John Dep., Def. Ex. D, at 24-25.)  Consequently, he did not inform Clarendon of Dobbs Tire's out-of-pocket payments made to satisfy the SIR obligation.  (Id. at 25.)  The payments made by CCMSI to satisfy the SIR obligation totaled less than the $100,000.  (Id. at 26.)  Mr. St. John requested records from Dobbs Tire representative James Bernardini of its out-of-pocket payments, but he never received them.  (Id. at 27.)

Mr. Bernardini testified in his February 2007 deposition that the day before was the first time he had attempted to determine whether Dobbs Tire's SIR obligation had been met. (Bernardini Dep., Pl. Ex. 10, at 148-49.)[4]

In support of Dobbs Tire's satisfaction of the SIR obligation, Koch has submitted 21 invoices from the law offices of Dobbs Tire's attorneys, the law firm of Green, Jacobson and Butsch, P.C. (Pl. Ex. 24.) These invoices total $50,301.25[5] and range in dates from June 23, 2003, to January 23, 2007.[6] (Id.)

In addition to the fees of $50,301.25, Koch states that Dobbs Tire, through CCMSI, paid $14,660.43 to customers to reimburse them for damage to their vehicles caused by the fire and $23,935.00 to settle fire-related claims with neighboring stores. (Pl. Mem. Doc. 78 at 5.) Clarendon accepts as supported by the evidence the figures of $14,120 to reimburse for damages to customers' automobiles caused by the fire and $21,435.00 for damage to neighboring stores. (Clarendon Mem. Doc. 64 at 20.) Koch counters that Dobbs Tire paid an additional $11,107.79 "toward costs arising out of the fire" and $16,703.98 "toward

---

[4]Mr. Bernardini testified that the day before he had produced a document referred to as "Exhibit 3" representing Dobbs Tire's fire-related, out-of-pocket payments. That exhibit is attached to another exhibit, Exhibit Z, submitted by Clarendon in support of its motion for summary judgment. Exhibit 3 lists a total of $59,365.60, including $14,060.43 listed as paid by CCMSI. This exhibit is not supported by any documentation.

[5]Koch's Exhibit 24 consists of 30 pages of separate invoices without a running total. In its memorandum, Koch totals these invoices at $50,301.25; in its memorandum, Clarendon places the total at $48,661.25. Giving Koch the benefit of the doubt, the Court will use Koch's figure.

[6]Indeed, the last two invoices are dated after the pending action was filed and concern this action. The total fees relating to this action are $8,588.75.

expenses arising out of the fire." (Pl. Mem. Doc. 78 at 5.[7]) The only exhibit cited by Koch in support of these figures is the collection of Green, Jacobson and Butsch, P.C.'s invoices.[8] (See id. and Pl. Stip. ¶¶ 31 & 32.) On the other hand, Clarendon cites the exhibits produced by Koch in answer to interrogatories in support of its figures. (See Def. Ex. Z at 36-77.)

Giving Koch the benefit of the doubt as to any dispute of facts and yet requiring that factual allegations be supported by the evidence, the Court finds that Dobbs Tire paid $50,301.25 for attorney's fees,[9] $14,120 for damages to customer cars, and $23,935 for damage to neighboring properties. These amounts total $88,356.25.

---

[7]In its Memorandum, Koch specifically lists five totals as amounts paid by Dobbs Tire in connection with the April 2003 fire: $50,301.25 in legal fees; $23,935 for claims by neighboring stores; $14,660.43 to customers whose vehicles were damaged; $11,107.79 toward fire-related costs, e.g., towing expenses, automobile rentals, repair of signage; and $16,703.98 "toward expenses arising out of the fire," e.g., automobile restorations services, automobile rentals (also included in the preceding total). Koch calculates the total of these five amounts as $116,807.45. (The Court calculates the amount as $116,*708*.45.) Reflective of the lack of certainty surrounding the SIR figures is the inconsistency between these amounts and two lists of potential claims submitted by Dobbs Tire to Clarendon. These two lists, submitted by Clarendon with its reply memorandum in support of its motion for leave to file an amended answer, includes a total of $14,160.43 paid out to four customers for damage to their vehicles and $116,300 in potential liability to others, including a dry cleaning store, a pet store, and $100,000 to Yorkshire Village, Inc. The potential liability claims were listed as not having been paid. The May 22, 2003, letter from CCMSI to Clarendon, see page 9, supra, also attached two lists, the second of which listed the dry cleaning store, a pet store, and Yorkshire Village. (Def. Ex. 23 at 20.) The total claims of the first two stores was $5,000, not the $16,300 previously listed, and the total potential claim of Yorkshire Village was $75,000, not the $100,000 previously listed.

[8]In support of its argument that Dobbs Tire satisfied the SIR, Koch also cites page 29 of its Exhibit 16 and pages 137-39 of its Exhibit 17. (Pl. Reply Mem. at 7, 8.) The former does not refer at all to the SIR and the latter is not included in the exhibit.

[9]For purposes of the instant motion, the Court will include the two invoices submitted after the instant action was filed and concern work done solely in connection with this action. As noted above, those two invoices total $8,588.75.

Harold Dubbs, an agent for Clarendon, testified in his deposition that Clarendon's insurance policy required that Dobbs Tire provide some documentation that it was obligated to pay an amount or had paid an amount in order for that obligation or payment to apply towards satisfaction of the SIR obligation. (Dubbs Dep., Def. Ex. KK, at 39-40, 298-99.) Once it has been determined that the insured has a duty to pay an amount exceeding the SIR, whether by judgment against the insured or a settlement agreement entered into by the insured, the insured may not be required to issue a check or cash to satisfy the SIR, but the insured must be obligated in some way to pay the amount in excess of the SIR to satisfy that condition of the policy. (Id. at 39-40.) Terri Courtney, another agent for Clarendon, testified that it is typical for Clarendon to require that the insured provide a proof of payment as evidence of satisfaction of the SIR. (Courtney Dep., Def. Ex. GG, at 137-40.)

On December 15, 2003, Clarendon wrote Dobbs Tire advising that the damages the Yorkshire Village Properties were seeking from Dobbs Tire were not covered its policy, nor was there any potential for coverage under the policy. (Pl. Ex. 3 at 1.) The letter explained that the denial of coverage was based upon the policy language defining "occurrence" and "property damage" and excluding coverage for certain property damage. (Id. at 2, 3.) The letter also advised Dobbs Tire that Clarendon would reconsider its position if Dobbs Tire provided any additional information or analysis. (Id. at 4.)

On March 20, 2004, Donald and Susan Dobbs, see note 1, supra, and Yorkshire Village amended the lease for the rebuilt Dobbs Tire facility on Laclede Station Road. (Def. Ex. K.) Under the terms of the lease, the Dobbses and Yorkshire Village agreed to, inter alia, "mutually release and discharge the other from all claims and liabilities arising from or caused

by any hazard covered by insurance on the demised premises . . . regardless of the cause of the damage or loss." (Def. Ex. K at 2.) On that same date, Yorkshire Village, the Dobbses, and Dobbs Tire entered into an "assignment and assumption of lease" whereby the Dobbses assigned all of their right, title, and interest in the lease to Dobbs Tire. (Def. Ex. L.)

The next month, on a Thursday, Yorkshire Village (now Koch) filed a petition in the Circuit Court for the City of St. Louis against James Wende and Dobbs Tire for damages it sustained in the April 2003 fire. (Pl. Ex. 31.) Service was held for an attorney's voluntary entrance of appearance. (Id. at 1.) The following Monday, that attorney, Martin Green with the law firm of Green, Schaff & Jacobson, P.C., now known as Green, Jacobson, & Butsch, P.C., sent by facsimile a copy of changes to a proposed confession of judgment in the case to the attorneys for Koch. (Def. Ex. N at 1.) Two days later, Mr. Green sent a cover letter, a copy of the petition, and a draft of a confession of judgment[10] with signature lines for Yorkshire Village's representative, each of the Dobbses, Dobbs Tire's representative, and Wende to Clarendon. (Id. at 2-12.) The letter demanded that Clarendon defend the case and provide coverage in connection with the state-court action without a reservation of rights; absent that course of action, Dobbs Tire and Wende would sign the confession of judgment. (Id. at 3-4.) On May 12, Mr. Green agreed to wait ten days before filing the confession of judgment in order to give Clarendon an opportunity to respond. (Id. at 14.) By letter dated July 2, Clarendon's counsel, Mr. Bruce Oetter with the law firm of Bryan Cave, LLP, advised Mr. Green that the SIR required the insured to pay $100,000 pursuant to the policy; the policy

---

[10]The judgment referred to an exhibit A that was apparently not included in the facsimile transmission.

excluded coverage for damaged property owned, rented or occupied by Dobbs Tire and property of others in Dobbs Tire's care, custody or control; the policy required the insured to cooperate with Clarendon in the investigation and defense of the state court case; and, if the insured executed the confession of judgment or any unauthorized settlement with Koch, coverage under Clarendon's policy would be forfeited. (Def. Ex. N at 26-30.) The letter also advised Mr. Green that, in part, "because the circumstances of the loss and extent of the loss to any non-excluded property is uncertain," Clarendon asserted "its right to associate with the Insured in the defense" of the suit. (Id. at 30.) Mr. Green responded, advising Mr. Oetter that unless he received "an unequivocal and unambiguous letter . . . stating that there is coverage for the fire loss," he would assume that Clarendon was denying coverage and would proceed accordingly. (Id. at 32-33.) The parties' correspondence continued in a similar vein through April 2005. (Id. at 34-101.)

On November 21, Mr. Green filed an answer to the state court petition on Dobbs Tire's and Wende's behalf. (Def. Ex. P.) This was done without consulting Clarendon and without forwarding a copy of the answer to Clarendon. (Def. Stip. ¶¶ 81, 83.) Two days later, in consideration of the sum of Ten Dollars and for "other good and valuable consideration," Yorkshire Village executed a complete release of the Dobbses, Dobbs Tire, and Wende for all claims and liabilities relating to the April 2003 fire. (Def. Ex. Q.) All parties to the release agreed that State Auto could "continue to maintain and exercise its subrogation rights" against Dobbs Tire, Wende, and their insurers. (Id.) Clarendon was not advised of this release. (Def. Stip. ¶ 85.)

By docket entry of November 29, the state-court action was set for a hearing on December 12. (Def. Ex. O at 2.) On December 2, counsel for Yorkshire Village filed a notice that Yorkshire Village would call for a hearing on damages the afternoon of December 12. (Pl. Ex. 42.) The certificate of service on the notice only listed Mr. Green. (Id.) Neither Clarendon's insured nor State Auto notified Clarendon of the December 12 hearing. (Green Dep., Def. Ex. R, at 32-33.) At the December 12 hearing, the parties presented the court a typed "Stipulation of Facts" describing the cause of the fire, outlining the duty owed by Dobbs Tire and Wende to Yorkshire Village, stating that they had breached this duty and were negligent, and stipulating that the damage was only to property that was in the exclusive care, custody, and control of Yorkshire Village. (Def. Ex. T.) The parties also stipulated that Dobbs Tire was not a tenant, implied, de facto, or any other type, of Yorkshire Village. (Def. Ex. T ¶ 3.) The Dobbses were stipulated to be the tenant. (Id.) A transcript identifies the short hearing held that day as a "Settlement Hearing." (Pl. Ex. 35 at 2.) One of the first questions asked of John Kotovsky, an employee of Yorkshire Village and one of the two witnesses, was whether one of the tenants of the mall was Dobbs Tire. (Id. at 3.) He replied, "Correct." (Id.) He and the other witness, Stephanie Holmes, a forensic accountant, testified about damages caused by the fire in reply to questions asked by Koch's attorney. (Id. at 6-14.) Mr. Green asked three questions relating to the property to which repairs were made and two questions relating to Mr. Kotovsky's identification of his signature. (Id. at 14-15.) At the conclusion of the hearing, the court found the damages were $818,587.26 for the costs of repairs and $163,950.90 for lost rents, for a total of $982,538.16. (Id. at 17.) It is clear from the transcript that nothing was in dispute at the hearing, following which the parties presented

the court with a "Proposed Findings of Fact & Judgment." (Pl. Ex. 35; Def. Ex. V.) The court crossed out the word "Proposed" and entered judgment in favor of Yorkshire Village and against Dobbs Tire and Wende in the amount of $982,538.19. (Def. Ex. V at 1, 2.) The same day, the court signed a "Covenant to Limit Recovery & Assignment of Claim" also signed by Dobbs Tire's and Yorkshire Village's respective representatives, Wende, and each of the Dobbses. (Def. Ex. W.) This covenant provided that (1) Clarendon denied coverage for the fire; (2) Yorkshire Village (a) would not execute the consent judgment against Dobbs Tire or Wende and (b) released the Dobbses for any claims arising out of the fire; and (3) Dobbs Tire, the Dobbses, and Wende would cooperate with Yorkshire Village when deemed necessary by its counsel. (Id.)

Also on December 12, Mr. Oetter wrote Mr. Green that he was "still waiting for the documents and information" previously requested and enclosing a copy of Clarendon's "Attorney Billing Guideline." (Def. Ex. N at 110-11.) Mr. Oetter outlined problems he had found with Mr. Green's firm's bills and asked that they be resubmitted in compliance with the guideline. (Id. at 110.) Once resubmitted, the bills would be applied to the SIR. (Id.) Mr. Oetter additionally asked to be informed if Yorkshire Village made a settlement demand or if there were any settlement negotiations. (Id.) Four days later, Mr. Green wrote Mr. Oetter that no further details of his firm's bills or information about settlement demands or negotiations would be forthcoming until Clarendon acknowledged coverage. (Id. at 113.) He also saw no further need to communicate with Mr. Oetter until such event occurred. (Id.) Mr. Green did not mention the consent judgment against Clarendon's insured. (Id.) Mr.

Oetter replied on December 21 that Clarendon had not denied coverage, but had reserved its rights and continued to do so.  (Id. at 114.)

Neither Dobbs Tire nor Yorkshire Village informed Clarendon that a judgment had been entered against its insured.  (Def. Stip. ¶ 105.)

In March 2006, Yorkshire Village filed an action for equitable garnishment against Clarendon in state court.  This action, removed to this court, seeks recovery of the judgment entered in the related state court action.

## Discussion

Summary Judgment Standard.  "Rule 56(c) [of the Federal Rules of Civil Procedure] 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" **Erenberg v. Methodist Hosp.**, 357 F.3d 787, 791 (8th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)) (alteration added).  An issue of material fact is genuine if it has a real basis in the record; and, a genuine issue of fact is material if it "might affect the outcome of the suit under the governing law." **Hartnagel v. Norman**, 953 F.2d 394, 395 (8th Cir. 1992) (citations omitted).

The initial burden is on the moving party to clearly establish the non-existence of any genuine issue of fact that is material to a judgment in its favor.  See **City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.**, 838 F.2d 268, 273 (8th Cir. 1988).  After the moving party discharges this burden, the non-moving party must do more than show that there is some doubt as to the facts.  See **Matsushita Elec. Indus. Co. v. Zenith Radio Corp.**, 475 U.S. 574,

586 (1986). "A [party] facing a summary judgment motion cannot 'get to the jury without any significant probative evidence tending to support the complaint[,]'" but must "make a sufficient showing on every essential element of its claim on which it bears the burden of proof." **Buettner v. Arch Coal Sales Co.**, 216 F.3d 707, 718 (8th Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)) (alterations added). And, "in order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." **Webb v. Lawrence County**, 144 F.3d 1131, 1135 (8th Cir. 1998). "'Evidence, not contentions, avoids summary judgment.'" **Larry v. Potter**, 424 F.3d 849, 851 (8th Cir. 2005) (quoting Zubaidy v. TEK Indus., Inc., 406 F.3d 1030, 1036 (8th Cir. 2005)). See also **Stanback v. Best Diversified Prods., Inc.**, 180 F.3d 903, 909 (8th Cir. 1999) (finding general statements in affidavits and depositions are insufficient to defeat a properly supported summary judgment motion).

Additionally, where the unresolved issues are primarily legal, rather than factual, summary judgment is particularly appropriate. See **Adams v. Boy Scouts of America - Chickasaw Council**, 271 F.3d 769, 775 (8th Cir. 2001); **Gordon v. City of Kansas City, Mo.**, 241 F.3d 997, 1002 (8th Cir. 2001).

Equitable Garnishment. Missouri's equitable garnishment statute provides that a judgment creditor is "entitled to have the insurance money, provided for in the contract of insurance between the insurance company . . . and the defendant, applied to the satisfaction of the judgment" if the defendant was insured against the loss or damage at issue in the underlying action. Mo.Rev.Stat. § 379.200 (alteration added). If satisfaction is not made

- 18 -

within thirty days, the judgment creditor may bring an action in equity against the defendant

and its insurance company.  Id.  "An equitable garnishment action is a legal proceeding,

authorized by § 379.200, to reach and apply insurance money in satisfaction of a judgment."

**Rogers-Ward v. Am. Standard Ins. Co. of Wisconsin**, 182 S.W.3d 589, 592 (Mo. Ct. App.

2005).  "The rights of the injured person bringing an action against the insurer for equitable

garnishment are derivative and can rise no higher than those of the insured, so that the insurer

may set up in the garnishment proceeding the defense of non-cooperation by the insured."

**Hayes v. United Fire and Cas. Co.**, 3 S.W.3d 853, 857 (Mo. Ct. App. 1999).  Thus, in such

an equitable garnishment action, "an injured party 'stands in the shoes' of the insured."

**Rogers-Ward**, 182 S.W.3d at 592 (quoting Smith v. Progressive Cas. Ins. Co., 61 S.W.3d

280, 283 (Mo. Ct. App. 2001)).  And, in garnishment proceedings, the plaintiff has the burden

of proving every essential fact on the garnishee's liability, including the issues of waiver and

estoppel.  **Mistele v. Ogle**, 293 S.W.2d 330, 332 (Mo. 1956).  Accordingly, because the

equitable garnishment action is derivative and the rights of the plaintiff bringing the action

can rise no higher than the rights of the insured, the defendant has a right to any defense it

would have had in the seminal state court action.

Self-Insured Retention.  In construing an insurance policy, the Court "must give each

terms its ordinary, lay meaning unless the policy expressly defines a term in a technical

manner." **Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.**, 401 F.3d 876,

880 (8th Cir. 2005) (citing Farmland Inds. Inc. v. Republic Ins. Co., 941 S.W.2d 505, 508

(Mo. 1997) (en banc)).  If the policy clearly defines a term, "absent a statute or public policy

requiring coverage," the policy definition controls.  **Heringer v. American Family Mut. Ins.**

**Co.**, 140 S.W.3d 100, 102-03 (Mo. Ct. Appt. 2004).  If, however, "the language of the policy is ambiguous, it is construed against the insurer."  **Id.**  "An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of words used in the contract."  **Id.** at 103.  An ambiguity does not exist merely because "the parties disagree over the interpretation of the terms of a contract[.]"  **Missouri Employers Mut. Ins. Co. v. Nichols**, 149 S.W.3d 617, 625 (Mo. Ct. App. 2004) (alteration added).

Additionally, the parties in an insurance policy "may bargain and agree to such terms and provisions as they see fit subject only to the requirement that the insurance contract is lawful and reasonable."  **Todd v. Missouri United School Ins. Council**, 223 S.W.2d 156, 160 (Mo. 2007) (en banc) (citing Williams v. National Cas. Co., 132 S.W.2d 244, 246 (Mo. 2004) (en banc)).  "Absent public policy considerations, an insured and the insurer are free to define and limit coverage by their agreement."  **Buehne v. State Farm Mut. Auto. Ins. Co.**, 232 S.W.3d 603, 606 (Mo. Ct. App. 2007).

The insured and the insurer, Clarendon, in the instant case agreed to an insurance policy providing, in the section defining "Self-Insured Retention," that the "Self-Insured Retention shall be primary or underlying to such insurance as is afforded by this policy.  The Insured shall pay 100% of such Self-Insured Retention *before this policy applies*."  (Def. Ex. C at 3 GIA) (emphasis added).  This language is clear and unambiguous:  the insured must pay or be obligated to pay amounts in satisfaction of the $100,000 SIR before Clarendon's duty to indemnify its insured arises.  This construction is consistent with relevant case law.  See, e.g. **U.S. Fidelity & Guarantee Ins. Co. v. Commercial Union Midwest Ins. Co.**, 430 F.3d 929, 937-38 (8th Cir. 2005) (defining SIR "as '[t]he amount of an otherwise-covered loss

- 20 -

that is not covered by an insurance policy and that usually must be paid before the insurer will

pay benefits'") (quoting <u>Black's Law Dictionary</u> 1391 (8th ed. 2004)) (alteration in original);

**United States v. Baxter Int'l, Inc.**, 345 F.3d 866, 894 n.20 (11th Cir. 2003) (same quote but

citing the 7th edition of <u>Black's Law Dictionary</u>); **Pac. Employers Ins. Co. v. Domino's**

**Pizza, Inc.**, 144 F.3d 1270, 1276-77 (9th Cir. 1998) ("It is well recognized that self-insurance

retentions are the equivalent to primary liability insurance, and that policies which are subject

to self-insured retentions are 'excess policies' which have no duty to indemnify until the self-

insured retention is exhausted."). <u>See also</u> **Geisner v. Budget Rent A Car of Missouri**, 967

S.W.2d 95, 96 (Mo. Ct. App. 1998) (discussing a SIR endorsement requiring that an amount

provided in the insurance contract be satisfied prior to reaching other exposure limits).

The question then is whether a genuine dispute of material fact remains about whether

the SIR was satisfied.

The fire at Dobbs Tire's Laclede Station Road facility was on April 3, 2003. On May

15, Clarendon advised Dobbs Tire of the $100,000 SIR. (Def. Ex. I at 16.) On May 22,

CCMSI cautioned Clarendon that, although the exact amount of loss was currently unknown,

the loss would "undoubtedly exceed" the SIR limit. (Pl. Ex. 23.) On July 18, counsel for

State Auto advised Dobbs Tire and CCMSI that the damages from the fire were expected to

be $850,000 to $900,000 and that a final figure was anticipated within the next two weeks.

(Def. Ex. I at 39-40.) CCMSI representative Mr. St. John testified that he prepared

documents recording the SIR payments made by CCMSI on behalf of Dobbs Tire, but he did

not have any record of additional SIR payments directly made by Dobbs Tire or its

representatives, nor was he ever informed of any such payments. His requests to Mr.

Bernardini, a Dobbs Tire representative, for such information were never satisfied. Indeed, Mr. Bernardini testified on February 6, 2007, that the first time he had attempted to determine whether the SIR obligation had been satisfied by Dobbs Tire was the day before. (<u>See</u> Bernardini Dep. at 148-49.) Consequently, Mr. St. John never informed Clarendon of any amount directly paid by Dobbs Tire to satisfy the SIR. Although he did inform Clarendon of the payments made by CCMSI, those payments did not reach the $100,000 limit. Therefore, CCMSI never provided Clarendon with notice or documentation that the SIR requirement was satisfied.

According to Clarendon's agent Harold Dubbs, Clarendon's insurance policy required that Dobbs Tire provide some documentation that it was obligated to pay, or had paid, an amount in order for that obligation or payment to be applied toward the SIR obligation. (<u>See</u> Dubbs Dep., Def. Ex. KK, at 39-40, 298-99.) Another Clarendon agent, Terri Courtney, testified that Clarendon typically required that its insured provide proof of payment as evidence of satisfaction of the SIR obligation. (<u>See</u> Courtney Dep., Def. Ex. GG, at 137-40.) Koch's argument that it was common business practice for Clarendon to consider the SIR obligation satisfied if the claim exceeded the SIR limit is not supported by the record.

The evidence before the Court is that Dobbs Tire and its agents provided Clarendon with documentation supporting paid claims for attorney's fees totaling $50,301.25,[11] claims for damage to customers' cars totaling $14,120, and claims for damage to neighboring stores totaling $23,935. These three amounts total $88,356.25 – $11,634.75 short of the $100,000

---

[11]<u>See</u> note 9, supra.

SIR obligation.  There is no evidence that Dobbs Tire provided Clarendon with any additional, supported claims that Dobbs Tire had paid, or was obligated to pay, other amounts.

The parties agreed in the insurance policy language that the insured "shall pay" all of the SIR before the policy applies.  See **Todd**, 223 S.W.3d at 161; **Buehne**, 232 S.W.3d at 606.  The evidence before the Court demonstrates that the SIR was not satisfied by the insured.  The Court further finds that the insured did not provide the insurer with proof that the SIR amount had been satisfied.

The Court, therefore, finds that Dobbs Tire failed to comply with a material condition of the insurance contract at issue.  Because, as noted above, Clarendon would have been able to raise this defense in the underlying state court action, it may raise it in this instant equitable garnishment proceeding.  For the reasons set forth above, the Court finds that Clarendon has established that its insured did not satisfy the necessary SIR obligation and that Clarendon has no duty to indemnify its insured for the claims against it arising from the April 2003 fire.

Collateral Estoppel.  Koch argues, however, that the doctrine of collateral estoppel makes the judgment from the state court action binding on Clarendon and precludes the assertion of the SIR defense.

"Generally, the doctrine of collateral estoppel (issue preclusion) precludes a party or those in privity with that party from relitigating issues that were necessarily and unambiguously decided in a previous case and final judgment."  **Hollida v. Hollida**, 190 S.W.3d 550, 554 (Mo. Ct. App. 2006).  This judicially-created doctrine prevents a party from

relitigating an issue that has already been decided. **State of Mo. ex rel. Sago v. O'Brien**, 827 S.W.2d 754, 756 (Mo. Ct. App. 1992).

> The elements of collateral estoppel are: (1) the issue decided in the prior case mirrors that in the present action; (2) the prior suit resulted in a final judgment on the merits; (3) the party against whom the doctrine is asserted participated as a party or in privity with a party to the prior adjudication; and (4) the party against whom the doctrine may apply had a full and fair opportunity to litigate the issue.

**Hollida**, 190 S.W.3d at 554.

The application of the doctrine of collateral estoppel to the instant case fails because the second (a judgment on the merits) and fourth (a full and fair opportunity to litigate) elements are not satisfied.

"A judgment on the merits is one rendered when it is determined which party is in the right after argument and investigation, as distinguished from a judgment rendered upon some preliminary or technical point, or by default, and without trial." **Wilkes v. St. Paul Fire & Marine Ins. Co.**, 92 S.W.3d 116, 121 (Mo. Ct. App. 2002) (citing Hayes, 3 S.W.3d at 856). "Where there is a question of whether a previous decision went to the merits of the case, no preclusive effect is given to the earlier decision." **Hangley v. Am. Fam. Mut. Ins. Co.**, 872 S.W.2d 544, 548 (Mo. Ct. App. 1994). See also **Amato v. State Farm Mut. Auto. Ins. Co.**, 213 S.W.3d 202, 205-06 (Mo. Ct. App. 2007) (holding that the doctrine of collateral estoppel did not prevent defendant insurance company from relitigating issue of negligence because settlement of first action was not a judgment on the merits); **Hayes**, 3 S.W.3d at 856-57 (holding that a judgment entered in a declaratory judgment action was not a judgment on the merits for purposes of applying the doctrine of collateral estoppel in an equitable garnishment

action); **Hangley**, 872 S.W.2d at 548 (holding that a summary judgment ruling was not a judgment on the merits; therefore, an action for equitable garnishment was not barred by collateral estoppel).

In the instant case, Koch argues that the December 12, 2005, hearing before the state court resulted in a judgment on the merits. The Court disagrees. There was nothing in dispute at that hearing. There was no substantive cross-examination, no argument, and no exhibits except those joint documents prepared and agreed to by both sides. The parties stipulated to the facts, including those irrelevant to the issues in *that* action and on which no evidence had been presented but relevant to the issue of insurance coverage, e.g., whether Dobbs Tire was a tenant, and to the damages; Dobbs Tire and Wende admitted liability. Following the brief hearing, the parties submitted proposed findings of fact and a judgment. The court signed this without any substantive change. Clearly, the proceedings were more akin to a settlement hearing, a friendly suit, or a distribution hearing in a wrongful death action than to a trial.

The character of the proceedings also negates the fourth element – a fair and full opportunity to litigate these issues. See **Wilkes**, 92 S.W.3d at 122-23 (finding the fourth element not satisfied in case in which, among other things, party seeking to apply doctrine had not notified opposing party of underlying action until after date by which opposing party could have applied for intervention, although the first party knew of the opposing party's interest in underlying action). "Under the facts of this case, fairness requires [the Court] to conclude that the application of collateral estoppel is not proper." **Id.** at 123 (alteration added).

## **Conclusion**

Because the Court has found that an equitable garnishment proceeding permits Clarendon to assert defenses it had a right to assert in the state court action, and because the Court has found that collateral estoppel does not preclude Clarendon from relitigating any issue relevant to the pending motions, and because the Court finds that Dobbs Tire failed to satisfy a condition in the insurance contract that must be complied with prior to the policy becoming applicable, the Court finds that summary judgment should be entered in favor of Clarendon.

Accordingly,

**IT IS HEREBY ORDERED** that the motion of Clarendon America Insurance Company for summary judgment is **GRANTED**.  [Doc. 63]

**IT IS FURTHER ORDERED** that the motion of Koch Development Co., Inc., for summary judgment is **DENIED**.  [Doc. 66]

**IT IS FINALLY ORDERED** that all other pending motions are **DENIED** as moot.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of January, 2008.